# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF SOUTH CAROLINA

|  |  |
|---|---|
| In re, | C/A No. 12-02509-dd |
| David Lawrence Paxton, | Adv. Pro. No. 12-80219-dd |
| Debtor. | Chapter 7 |
| CoastalStates Bank, | |
| Plaintiff, | **ORDER** |
| v. | |
| David Lawrence Paxton, | |
| Defendant. | |

This adversary proceeding is before the Court on the complaint of the plaintiff, CoastalStates Bank ("Plaintiff"), seeking a determination that a debt owed to it by defendant and debtor, David Lawrence Paxton ("Defendant"), is nondischargeable under 11 U.S.C. §§ 523(a)(2)(A), (a)(2)(B), and (a)(4). At trial, Plaintiff withdrew its causes of action under sections 523(a)(2)(B) and (a)(4) and proceeded only under section 523(a)(2)(A). Jurisdiction for this proceeding is premised upon 28 U.S.C. §§ 1334 and 157(a). Venue is proper under 28 U.S.C. § 1409. This adversary proceeding is a core proceeding. 28 U.S.C. § 157(b)(2)(I).

Defendant answered the complaint. A trial was held on August 14, 2013. After careful consideration of the applicable law, arguments of counsel, and evidence submitted, the Court

issues the following findings of fact and conclusions of law under Federal Rule of Civil

Procedure 52(a), made applicable by Federal Rule of Bankruptcy Procedure 7052.[1]

## FINDINGS OF FACT

1.      Plaintiff is a banking corporation organized and existing under the laws of the

United States and doing business in Beaufort County, South Carolina.

2.      Defendant is the debtor in the chapter 7 case underlying this adversary

proceeding.

3.      Defendant filed his voluntary petition for relief under chapter 7 of the Bankruptcy

Code on April 19, 2012.  Debtor's bankruptcy case is captioned *In re David Lawrence Paxton*,

Case No. 12-02509-dd, and is pending before this Court.

4.      Walter N. Lawson, John Hass, and Defendant testified at the trial.  Lawson is

senior vice president for commercial lending for Plaintiff.  John Hass is the state-court appointed

receiver for Southeastern Fire, LLC; Southeastern Fire of Georgia, LLC; Pinnacle Fire Systems,

LLC; and National Fire Suppression, Inc.

5.      Debtor owned or managed at various times all of the companies for which Hass

served as receiver.  These companies designed, serviced, and installed fire suppression systems.

6.      Defendant moved to Hilton Head, South Carolina in 1988 and started a business

called Automatic Fire Sprinklers.  He sold this business in 2004 to Greg Goodrich.

7.      In 2005 or 2006, Goodrich approached Defendant about starting a company to

pursue government minority set-aside contracts.

---

[1] To the extent any of the following findings of fact constitute conclusions of law, they
are adopted as such, and to the extent any of the following conclusions of law constitute findings
of fact, they are adopted as such.

8.      Defendant's mother is a disabled veteran because she was blinded while serving in the military and is eligible for these set-aside contracts.

9.      Defendant's mother does not have an engineering background.  She also does not have the knowledge or ability to design and install fire suppression systems.

10.     In 2005 or 2006, Goodrich and Defendant's mother established a company called Southeastern Fire of Georgia, LLC.  Defendant was the manager of this entity at that time.

11.     Defendant eventually purchased the interests of Goodrich and his mother in Southeastern Fire of Georgia, LLC and became the sole member of that company.

12.     Southeastern Fire of Georgia, LLC had a sales person that wanted to open an office in Charleston, South Carolina.  Defendant wanted separation between Southeastern Fire of Georgia, LLC and this new office so he established National Fire Suppression, Inc.

13.     One of the sales persons at National Fire Suppression, Inc. started Pinnacle Fire Systems, LLC.  However, the sales person was unable to complete a project, and Defendant took over ownership of Pinnacle Fire Systems, LLC and completed the project.

14.     In approximately 2010, Defendant's businesses were the successful bidder on three projects.  A performance bond had to be provided for one of these projects.  The estimate upon which the bid was based was for approximately 688 sprinkler heads, and the project ended up needing nearly 1,300 sprinkler heads.  Defendant's businesses were unable to complete the project, and the bond was called.  The bond call resulted in Defendant's creditors cutting off lending to him and the entities he owned.  The bond call and cutting off of Defendant's credit occurred at the end of 2010.  Additionally, Defendant's financial issues resulted in his suppliers no longer providing supplies on credit to him.  Because Defendant was associated with all three companies, he was unable to bid on projects under any of the three companies.

3

15.     Defendant had a banking relationship with Lawson beginning in the early 1990s prior to Lawson becoming an employee of Plaintiff.

16.     In 2010, Defendant had three loans with Plaintiff.  The total principal of the three loans Defendant owes to Plaintiff is approximately $765,000.

17.     The first loan was in Defendant's name and was a $265,000 consolidation of existing debt.

18.     The $265,000 consolidation loan is dated July 30, 2010, and is labeled a "Commercial Loan Agreement" ("July 2010 consolidation loan").  Pl.'s ex. 3.  Section 5.E. of the Agreement contains a New Organizations clause, which states:

> New Organizations.  I will obtain your written consent and any necessary changes to the Loan documents before I organize or participate in the organization of any entity, merge into or consolidate with any one, permit any one else to merge into me, acquire all or substantially all of the assets of any one else or otherwise materially change my legal structure, management, ownership or financial condition.

*Id*.  Section 6.C. of the Agreement provides that Defendant "will be in default if . . . [he] merge[s], dissolve[s], reorganize[s], end[s] [his] business or existence, or a partner or majority owner dies or is declared legally incompetent."  *Id*.  Section 6.E. and 6.F. state that Defendant is in default if "[a] default occurs under the terms of any other transaction document" or he is "in default on any other debt or agreement [he] [has] with [Plaintiff]."  *Id*.

19.     Of the $265,000 in debt that was consolidated, approximately $205,000 was the deficiency from a short sale of a "spec home" Plaintiff financed for Defendant.

20.     Southeastern Fire of Georgia, LLC and National Fire Suppression, Inc. signed security agreements for the July 2010 consolidation loan securing the loan with five vehicles.  *Id*. Defendant's wife; National Fire Suppression, Inc.; Pinnacle Fire Systems, LLC; and Southeastern Fire of Georgia, LLC signed guarantees.  *Id*.

21.     Defendant's mother reserved the name Southeastern Fire, LLC with the South Carolina Secretary of State on August 30, 2010.  Pl.'s ex. 6.

22.     Southeastern Fire, LLC, is a company wholly owned by Defendant's mother and managed by Defendant.

23.     Defendant's mother lived in Illinois and was 78 years old at the time Southeastern Fire, LLC was formed.

24.     Southeastern Fire, LLC was in the same industry as the entities Defendant owned but had different clientele.  Similar to Southeastern Fire of Georgia, Southeastern Fire, LLC was established for the purpose for procuring set-aside government contracts for minorities, such as disabled veterans, or projects where there is federal or state funding involved and the general contractors need to have a certain percentage of minority contractors.  Defendant testified Southeastern Fire, LLC would target only these types of projects.  Southeastern Fire of Georgia was not eligible for these projects because Defendant's mother was no longer an owner.

25.     The operating agreement for Southeastern Fire, LLC has an effective date of January 15, 2011.  Pl.'s ex. 5.  Defendant prepared the operating agreement for Southeastern Fire, LLC following the format of the operating agreement Goodrich and Defendant's mother used for Southeastern Fire of Georgia, LLC.

26.     On December 10, 2010, Plaintiff loaned $100,000 to Pinnacle Fire Systems, LLC under a "Commercial Loan Agreement" ("December 2010 loan").  Pl.'s ex. 2.  Defendant signed a guarantee.  *Id*.  Defendant; National Fire Suppression, Inc.; Southeastern Fire of Georgia, LLC; and Pinnacle Fire Systems, LLC signed security agreements.  *Id*.

27.     Lawson testified Plaintiff made the December 2010 loan because Defendant was behind on his payments to suppliers for his businesses and needed to be current on his payments

to his suppliers in order to continue bidding on and obtaining projects.  Defendant was behind on these payments because of the bond call that occurred at the end of 2010.  Plaintiff was aware of the bond call at the time it made the loan.  Lawson testified the projects on which Defendant was bidding included a project at Valdosta State University ("Valdosta State project") and a student housing project at University of South Carolina at Beaufort("USCB student housing project").

28.     Lawson's understanding that these were projects on which Defendant submitted bids was based on a document Defendant provided to Lawson in connection with the December 2010 loan entitled "Jobs Status and Bids Made in 2010."[2]  The list included bids that were outstanding.   Therefore, Plaintiff understood that Defendant did not know at the time this document was submitted whether he would be the successful bidder on all of the projects listed.

29.     Lawson agreed Plaintiff did not rely on this list of bids because it did not know which bids would be accepted.

30.     This list showed an estimated net profit of $245,000 from the bids listed.

31.     Plaintiff issued the checks that constituted the $100,000 loan proceeds directly to the suppliers.

32.     Defendant testified that he did not make a formal application for the $100,000 loan.  He also testified he told Plaintiff the $100,000 would pay the bills, but it was similar to "putting a band aid on major surgery" and more was needed to save his businesses.

33.     Plaintiff also issued a $10,000 standby line of credit on December 10, 2010, in favor of Elkins Constructors, Inc. on behalf of Southeastern Fire of Georgia, LLC.  Pl.'s ex. 4. Elkins was the general contractor on the Valdosta State project.   The line of credit was a requirement in lieu of obtaining a performance bond.   Lawson later learned that the

---

[2] This document was not introduced into evidence.

subcontractor on the Valdosta State project was Southeastern Fire, LLC rather than Southeastern Fire of Georgia.[3]

34.    Pinnacle Fire Systems, LLC and Plaintiff entered into a "Debt Modification Agreement" on February 23, 2011, which was a renewal of a $400,000 note dated July 30, 2010, that matured on February 1, 2011 ("February 2011 renewal").   Pl.'s ex. 1.    Defendant; Southeastern Fire of Georgia, LLC; and National Fire Suppression, Inc. signed guarantees in connection with the July 30, 2010 note.   *Id*.   Defendant; National Fire Suppression, Inc.; Southeastern Fire of Georgia, LLC; and Pinnacle Fire Systems, LLC signed security agreements in connection with the July 30, 2010 note.   *Id*.   Defendant; Southeastern Fire of Georgia, LLC; and National Fire Suppression, Inc. consented to the February 2011 renewal.   *Id*.

35.    Lawson testified Plaintiff agreed to the February 2011 renewal because Defendant had paid the interest to date, and it was part of Defendant's plan to rehabilitate his businesses.

36.    Lawson testified that at the time of the execution of the February 2011 renewal, Defendant described potential projects, including the Valdosta State project and the USCB student housing project.

37.    Again, Lawson's understanding that these were projects on which Defendant submitted bids was based on a document entitled "Jobs Status and Bids Made in 2010."   The list included bids that were outstanding.   Therefore, Plaintiff understood that Defendant did not know at the time this document was submitted whether he would be the successful bidder on all of the projects listed.

---

[3] There was no evidence or testimony regarding whether Plaintiff's issuance of this standby line of credit meant that Defendant knew Southeastern Fire, LLC was the successful bidder on the Valdosta State project on December 10, 2010, which is the date of the December 2010 loan.

38.    Defendant introduced into evidence underwriting packages used by Plaintiff in 2008 and 2010 to determine whether Defendant qualified for loans.  Def.'s exhibits A, B.  The 2008 underwriting package included a personal financial statement for Defendant while the 2010 underwriting package included no such statement.

39.    The 2010 underwriting package was used in the determination of whether to make the July 2010 consolidation loan and February 2011 renewal loan.

40.    The 2010 underwriting package states that "Southeastern Fire of Georgia, LLC (100% owned by [Defendant]) is requesting renewal of an existing $400M working capital line of credit ***769, however, the borrower will now be Pinnacle Fire Systems, LLC.  As of 1/1/10, Southeastern Fire of Georgia and an affiliated company known as National Fire Suppression, Inc. (S Corp 100% owned by [Defendant]) were merged into the new company known as Pinnacle Fire Systems, LLC (100% owned by [Defendant])."[4]   Def.'s ex. B.   The 2010 underwriting package contains additional information regarding the history of Defendant's business entities:

> David Paxton's primary operating business had originally been Southeastern Fire of Georgia, LLC which was formed in March 2005 (100% owned by David) and began operations in mid-2005, following the sale of a similar company.  Southeastern Fire [of Georgia] performs consultation, design, fabrication, and installation of fire protection systems primarily in Georgia. Initially, Paxton's mother was the majority owner of the company which at one time qualified it for minority business status.  As a result, the majority of the work performed by this company had been government contracts.  The work was

---

[4] The inconsistency of Plaintiff's belief, according to the 2010 underwriting package, that as of January 1, 2010, Southeastern Fire of Georgia and National Fire Suppression were merged into Pinnacle Fire Systems, the requirement as part of the July 2010 consolidation loan and the July 2010 note renewed in February 2011 that Southeastern Fire of Georgia and National Fire Suppression sign guarantees and security agreements, the issuance of the standby line of credit on behalf of Southeastern Fire of Georgia in December 2010, the dissolution of Southeastern Fire of Georgia in March 2011, the dissolution of National Fire Suppression and Pinnacle Fire Systems in November 2011, and the fact that Defendant primarily ended up operating under Southeastern Fire, LLC was never reconciled.

usually performed under contracts with a fixed-price or cost-plus.  The lengths of the contracts varied but were typically less than one year.  In late-2006, Paxton formed National Fire Suppression, Inc. (S Corp).  It performs the same services as Southeastern Fire of Georgia, primarily in South Carolina and Georgia, but its focus is on the private industry.  Effective 1/1/10, Paxton took over ownership of a third company, Pinnacle Fire Systems, LLC.  David's 100% interest was accepted by the prior owner, Edward T. Carter, for consideration of delivery of the title to a 2000 Ford CTV3DC.  This Company primarily does business in the Beaufort County area.

Def.'s ex. B.

41.    In connection with the general economic outlook in the industry in which

Defendant worked, the 2010 underwriting package states:

During the past two years, the commercial and residential building economy in the low country has, for the most part, collapsed.  Many construction related businesses have failed as a direct result of the decline in construction starts and developments.  In an environment where top line revenue is dropping, profit margins are narrowing and competitive pressure for work is at an all time high, doing business has been very challenging.  The overall U.S. economy is weak and a return to historical levels of the past 10 years is highly improbable for quite some time.

Def.'s ex. B.

42.    The underwriting package contains additional analysis regarding the condition of

Defendant's businesses:

According to CFO Tony Chambery, new awarded business began to slow significantly in 2008 although actual installation of systems continued at a decent pace.  By the end of 2008, the company was using up its backlog of orders and revenue continued to flow.  Cost structure of the business and overhead continued unchanged into 2009 yet fewer and less profitable contracts were being obtained.  The effect of not reducing overhead and direct job costs versus the narrowing margin of profit became painfully clear by mid 2009.  As 2009 continued, winning a bid in the fire sprinkler market was done only by undercutting the competition and becoming the lowest cost provider.  At Pinnacle, as with other companies, winning the bid was actually a losing proposition because the direct job costs and overhead structure had not been reduced enough to net out a profit on some contracts.  Late in 2009 it became clear that a major restructuring was required.

Def.'s ex. B.

43.     The 2010 underwriting package indicates Plaintiff knew Defendant potentially owed the Internal Revenue Service $210,000.  Def.'s ex. B.  Defendant hoped to reduce this amount to $140,000 by negotiation with the Internal Revenue Service.  *Id.*

44.     Defendant had been slow in making payments on the $400,000 loan at the time of the February 2011 renewal.

45.     Shortly after the February 2011 renewal, Defendant learned about a large project, referred to as the Gulfstream project, for which one of the subcontracts was ultimately completed by Southeastern Fire, LLC.  The Gulfstream project involved the rehabilitation of three aircraft hangars in Savannah, Georgia.  Haskell Company was the contractor on the project.  Defendant was not aware of the Gulfstream project until Jack McDowell, an employee at Southeastern Fire, LLC, received an email on February 25, 2011.  Def.'s ex. G.

46.     Southeastern Fire, LLC bid on the subcontract for rehabilitating the fire protection system for one of the three hangars.  The hanger was 80,000 square feet.

47.     Around May of 2011, Defendant told Lawson about the Gulfstream project.

48.     According to Lawson, Defendant indicated it was a big, lucrative project that might help him out of his financial struggles.

49.     The Gulfstream project subcontract was awarded to Southeastern Fire, LLC in July of 2011.  Pl.'s ex. 17.  The contract was in the amount of $1,143,900.  *Id.*

50.     After the Gulfstream project was completed, there was between $200,000 and $250,000 in Southeastern Fire, LLC's bank account.   No distribution was withdrawn for Defendant or his mother.  These funds were used for operating expenses to keep Southeastern Fire, LLC operating.

51.     Defendant's businesses continued to struggle after the Gulfstream project.

10

52.     Southeastern Fire of Georgia, LLC was dissolved on March 25, 2011.  Pl.'s ex. 15.

53.     National Fire Suppression, Inc. and Pinnacle Fire Systems, LLC were dissolved on November 4, 2011.  Pl.'s ex. 21.

54.     Lawson testified he learned about the existence of Southeastern Fire, LLC in January 2012.

55.     Defendant testified he thought Lawson knew about Southeastern Fire, LLC at an earlier date.  Defendant did not inform Plaintiff about the formation of Southeastern Fire, LLC in writing.

56.     Lawson knew that over the course of their banking relationship, Defendant had numerous different companies operate, close, and sell assets.  Defendant never provided written notice of changes in the status of his companies.

57.     Plaintiff introduced a July 31, 2012 profit and loss statement for Southeastern Fire, LLC.  The statement shows net income of $26,666.62 for a project labeled "USCB Student Housing 2010" and $26,784.93 for a project labeled "Valdosta State Psych. Bldg."  Pl.'s ex. 23.

58.     The USCB student housing project was not a government set-aside contract.

59.     The Valdosta State project was a project where government funding was involved and the general contractor sought to have a certain percentage of minority subcontractors.

60.     Plaintiff introduced into evidence three checks in the total amount of $8,500 that were written on Southeastern Fire of Georgia, LLC's bank account and payable to Southeastern Fire, LLC.  Pl.'s ex. 7.  These checks are dated October 12, 2010; November 29, 2010; and November 30, 2010.  *Id.*  Defendant testified Southeastern Fire, LLC paid back the $8,500.

61.    Prior to trial, Plaintiff's counsel, on several occasions, requested documentation showing the $8,500 was reimbursed.  Defendant indicated he has this documentation but has not provided it to Plaintiff's counsel.

62.    The operating agreement for Southeastern Fire, LLC provides that Defendant will receive a salary of $750 per week, a company-owned automobile for personal and business use, a health insurance policy providing coverage for him and his family, and bonuses at the discretion of the members when the company has net profits.  Pl.'s ex. 5.

63.    Hass, who is the state-court appointed receiver for Southeastern Fire, LLC; Southeastern Fire of Georgia, LLC; Pinnacle Fire Systems, LLC; and National Fire Suppression, Inc., testified that Southeastern Fire, LLC paid some of Defendant's personal bills.  These personal bills included health insurance for Defendant and his wife, a satellite television bill, and a dry cleaning bill.  Defendant had a television on his desk in his office.  Hass testified the only exorbitant bill was the dry cleaning bill, which was almost $300.

64.    Defendant cooperated with Hass during the receivership and provided the financial records Hass requested.  Hass provided access to these financial records to Mr. Patterson, who is an attorney for Plaintiff.  Hass's understanding was that Patterson was looking for large transfers of cash from the entities for which Hass was acting as a receiver.  Hass is not aware of Patterson finding any evidence of such activity.

65.    Defendant received no salary from Southeastern Fire, LLC for eighteen months.

66.    Defendant did not earn enough through Southeastern Fire, LLC to make his home mortgage payments, and he lost his home.

67.     Defendant testified he did not form Southeastern Fire, LLC with the intent of avoiding payment of the debt to Plaintiff and would have paid the debt if Southeastern Fire, LLC had been profitable.

68.     Lawson testified that if Plaintiff had known about Southeastern Fire, LLC, it would have required it to become a co-borrower on the debts owed by Defendant and the entities he owned.[5]

69.     Defendant testified, without objection, that his mother would not have agreed to her assets and the assets of Southeastern Fire, LLC serving as security for the debts owed to Plaintiff by Defendant and his three companies

## CONCLUSIONS OF LAW

A central purpose of the Bankruptcy Code "is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'"   *Grogan v. Garner*, 498 U.S. 279, 286 (1991) (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934)).   However, the Bankruptcy Code "limits the opportunity for a completely unencumbered new beginning to the 'honest but unfortunate debtor.'"   *Id.* at 286-87 (quoting *Hunt*, 292 U.S. at 244).   Section 523(a) of the Bankruptcy Code sets forth certain kinds of obligations that Congress deems to be nondischargeable.   *Id.* at 280-81.

---

[5] Lawson's testimony that Plaintiff wanted Defendant and all of his various entities obligated on all of the outstanding loans is inconsistent with the fact that only Defendant signed a guarantee for the December 2010 loan on which Pinnacle Fire Systems was the borrower.  Pl.'s ex. 2.   Southeastern Fire of Georgia and National Fire Suppression only signed security agreements in connection with this loan.  *Id.*   However, the fact that Pinnacle Fire Systems was the borrower on the December 2010 loan and Defendant the only guarantor is consistent with the statement in the 2010 underwriting package that Southeastern Fire of Georgia and National Fire Suppression merged with Pinnacle Fire Systems in January 2010.

As the party asserting a debt owed to it is nondischargeable, Plaintiff bears the burden of proof, which is by a preponderance of the evidence. *Id.* at 291. In addressing exceptions to discharge, courts "traditionally interpret the exceptions narrowly to protect the purpose of providing debtors a fresh start" but "are equally concerned with ensuring that perpetrators of fraud are not allowed to hide behind the skirts of the Bankruptcy Code." *Foley & Lardner v. Biondo* (*In re Biondo*), 180 F.3d 126, 130 (4th Cir. 1999).

Under 11 U.S.C. § 523(a)(2)(A), debts "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition" are not dischargeable. "[F]alse pretenses, a false representation, or actual fraud" are "common-law terms, and . . . they imply elements that the common law has defined them to include." *Field v. Mans*, 516 U.S. 59, 69 (1995). At the time section 523(a)(2)(A) was enacted in 1978 and now, "the most widely accepted distillation of the common law of torts was the Restatement (Second) of Torts (1976), published shortly before Congress passed the [1978 Bankruptcy Reform] Act." *Id* at 70. Likewise, the Fourth Circuit has referred to the Restatement in defining what a plaintiff must show under section 523(a)(2)(A). *See Biondo*, 180 F.3d at 134. To prevail under section 523(a)(2)(A), "a plaintiff must prove four elements: (1) a fraudulent misrepresentation; (2) that induces another to act or refrain from acting; (3) causing harm to the plaintiff; and (4) the plaintiff's justifiable reliance on the misrepresentation."[6] *Id.*

---

[6] The Fourth Circuit has set forth these elements differently since *Biondo*. *See SG Homes Assoc., LP v. Marinucci*, 718 F.3d 327, 334 (4th Cir. 2013) ("A plaintiff's proof of fraud under [section 523(a)(2)(A)] requires satisfaction of the elements of common law fraud: '(1) false representation, (2) knowledge that the representation was false, (3) intent to deceive, (4) justifiable reliance on the representation, and (5) proximate cause of damages.'" (quoting *Nunnery v. Rountree* (*In re Rountree*), 478 F.3d 215, 218 (4th Cir. 2007)). The difference between how the elements of section 523(a)(2)(A) are stated in *Biondo* as opposed to subsequent

Plaintiff has shown that Defendant made representations.  On July 30, 2010, Defendant represented in the July 2010 consolidation loan agreement that he would "obtain [Plaintiff's] written consent and any necessary changes to the Loan documents before [he] organize[d] or participate[d] in the organization of any entity . . . or otherwise materially change[d] [his] legal structure, management, ownership or financial condition."  The other representations made by Defendant were in connection with the December 2010 loan and February 2011 renewal loan when he included the Valdosta State project and USCB student housing project on the list of bids that were outstanding or had been accepted.

Having shown representations were made, Plaintiff must prove the remaining elements of its claim, including that Defendant knew the representations were false and made them with intent to deceive.  A broken promise, without more, is not fraud.  Rather, "'[i]f, at the time he made his promise, the debtor did not intend to perform, then he has made a false representation (false as to his intent) and the debt that arose as a result thereof is not dischargeable (if the other elements of § 523(a)(2)(A) are met).  If he did so intend at the time he made his promise, but subsequently decided that he could not or would not so perform, then his initial representation

cases is largely without substance.  The first element under *Biondo* encompasses elements one and two as stated in cases after *Biondo*.  *See* Restatement (Second) of Torts § 526 (1977) ("A misrepresentation is fraudulent if the maker (a) knows or believes that the matter is not as he represents it to be, (b) does not have the confidence in the accuracy of his representation that he states or implies, or (c) knows that he does not have the basis for his representation that he states or implies.").  Moreover, an argument that the maker of a misrepresentation did not intend to deceive the recipient is akin to asserting the maker did not intend to induce the recipient to act or refrain from acting, which is the second element of the test under *Biondo*.  *See Biondo*, 180 F.3d at 134.  The fifth element of a section 523(a)(2)(A) claim as set forth in cases after *Biondo*, which is proximate cause of damages, can be a source of confusion because it may lead a debtor to argue that a misrepresentation did not proximately cause any damage since he or she could not have paid the debt at issue anyway, particularly where the alleged misrepresentation is in connection with an extension, renewal, or refinancing of credit.  *See id*. at 135.  However, "[i]t is axiomatic that in the context of a claim for exception to discharge under § 523(a)(2)(A), the harm or damage is the provision of credit."  *Id*.

15

was not false when made.'"  *Mills v. Hyman* (*In re Hyman*), 219 B.R. 699, 702 (Bankr. D.S.C.

1998) (quoting *Palmacci v. Umpierrez*, 121 F.3d 781, 787 (1st Cir. 1997)); *see also* Restatement

(Second) of Torts § 530 (1977) ("A representation of the maker's own intention to do or not to

do a particular thing is fraudulent if he does not have that intention.").  "In determining whether

a debtor possessed fraudulent intent, the question is whether the debtor subjectively intended to

defraud the creditor."  *Lind Waldock & Co. v. Morehead*, 1 Fed. Appx. 104, 107 (4th Cir. 2001)

(per curiam).  Finally, it is well-established that "[b]ecause direct proof of intent (*i.e.,* the

debtor's state of mind) is nearly impossible to obtain, [a] creditor may present evidence of the

surrounding circumstances from which intent may be inferred."  *Caspers v. Van Horne* (*In re

Van Horne*), 823 F.2d 1285, 1287 (8th Cir. 1987), *abrogated on other grounds, Grogan*, 498

U.S. at 291.

Defendant made a representation on July 30, 2010, when he signed the July 2010

consolidation loan agreement that he would not organize or participate in the organization of

another legal entity without obtaining Plaintiff's written consent.  Defendant's mother reserved

the name Southeastern Fire, LLC with the South Carolina Secretary of State on August 30, 2010.

Pl.'s ex. 6.  The operating agreement for Southeastern Fire, LLC has an effective date of January

15, 2011.  Pl.'s ex. 5.  Other than the fact that Defendant ultimately did participate in the

organization of another legal entity and the close proximity in time between these events, there is

no evidence that he did not intend to keep the promise he made in the July 2010 consolidation

loan agreement.  Defendant was personally liable on the July 2010 consolidation loan and the

other two outstanding debts owed to Plaintiff even if Southeastern Fire, LLC was not.  Therefore,

any distributions made to him from that company potentially would have been subject to a

collection effort by Plaintiff.  While he did not provide written notice of the formation of

Southeastern Fire, Defendant testified he believed Plaintiff knew about the entity.  Moreover, during the course of their banking relationship, Plaintiff knew Defendant had numerous different companies operate, close, and sell assets.  Plaintiff also knew Defendant had never provided written notice of changes in the status of his companies.  There is no evidence, other than proximity in time, that Defendant in July 2010 intended to form Southeastern Fire, LLC at the end of August.  In addition, while the impression given by the testimony at trial was that the formation of Southeastern Fire was Defendant's idea, Defendant's mother was the person who reserved the name on August 30, 2010.  The operating agreement, which Defendant testified to preparing, has an effective date of January 15, 2011.  The formation of Southeastern Fire occurred at a time when Defendant's businesses could not compete for contracts.

The manner in which Southeastern Fire operated also does not suggest intent to deceive. The only unusual bill Southeastern Fire, LLC paid on Plaintiff's behalf was a nearly $300 dry cleaning bill, not the stuff of fraud in connection with several hundred thousand dollars in loans. There is no evidence of large transfers of cash out of Southeastern Fire or dilution of its assets. The evidence before the Court is that money earned on projects it completed went toward operations.  Even when there was between $200,000 and $250,000 in Southeastern Fire, LLC's bank account after completion of the Gulfstream project, these funds were not distributed to Defendant or his mother.  Rather, these funds were used for operating expenses.  The Court finds Defendant's testimony about the purpose of establishing Southeastern Fire to bid on minority set-aside contracts and contracts where a subcontractor's minority status was an advantage to be credible.

With respect to the inclusion of the Valdosta State project and USCB student housing project on the document entitled "Jobs Status and Bids Made in 2010," which was given to

17

Plaintiff at the time of the December 2010 loan and February 2011 renewal, the Court again finds Plaintiff has not met its burden with respect to proving fraudulent intent. Similar to the representation in the July 2010 consolidation loan agreement, the Court makes this finding based on the fact that Defendant was personally liable on the debts, on the course of dealing between the parties, and on the manner in which Southeastern Fire, LLC was operated. In addition to finding Plaintiff has not met its burden of proof with respect to fraudulent intent, the Court also finds Plaintiff has not shown by a preponderance of evidence that it justifiably relied on the Jobs Status and Bids Made in 2010 list. "To satisfy the justifiable reliance element . . . , a plaintiff must show that it actually relied on the debtor's misrepresentations, and was justified in doing so because of 'the circumstances of the particular case.'" *SG Homes Assoc.*, 718 F.3d at 335 (quoting *Field*, 516 U.S. at 71). It is clear from Lawson's testimony that Plaintiff did not actually rely on the Jobs Status and Bids Made in 2010 list to determine whether to make the loans and whether Defendant's businesses would actually generate profit to pay the loans, as the list included both accepted and outstanding bids. Indeed, Lawson agreed Plaintiff did not rely on the list because it did not know which bids would be accepted. Consequently, while the list included the Valdosta State project and USCB student housing project, Plaintiff knew Defendant might not be the successful bidder on these projects when it made the December 2010 loan and entered into the February 2011 renewal. Even if Plaintiff had relied on the list, its reliance would not have been justifiable.

As for the $100,000 loaned to Pinnacle Fire Systems, LLC in December 2010, the evidence is not clear as to the basis for Plaintiff extending this loan. Plaintiff knew from the 2010 underwriting package that Defendant's business was struggling. Plaintiff also knew about the bond call and that Defendant was behind on his payments to his suppliers, which resulted in

them cutting off credit for supplies he and his businesses needed.  Defendant testified that he did

not formally apply for the $100,000 loan.  He also testified he told Plaintiff the $100,000 would

pay the bills, but it was similar to "putting a band aid on major surgery" and more was needed to

save his businesses.  In the end, the Court does not find, based on the evidence before it, this loan

to be the product of fraud.

Finally, to the extent Plaintiff is proceeding on a false pretense theory rather than a false

representation theory, the Court does not find that Defendant acted with fraudulent intent in

fostering some type of false pretense for the same reasons it does not find that Defendant made

representations with fraudulent intent.[7]  *See Nat'l Bank of N. Am. v. Newmark* (*In re Newmark*),

---

[7] The December 2010 loan agreement contains a New Organizations clause identical to the clause in the July 2010 consolidation loan agreement.  This clause in both agreements provides as follows:

> New Organizations.  I will obtain your written consent and any necessary changes to the Loan documents before I organize or participate in the organization of any entity, merge into or consolidate with any one, permit any one else to merge into me, acquire all or substantially all of the assets of any one else or otherwise materially change my legal structure, management, ownership or financial condition.

Under both agreements, "[t]he pronouns 'I,' 'me' and 'my' refer to every Borrower signing [the agreements], individually or together, and their heirs, successors and assigns."  Pinnacle Fire Systems, LLC was the Borrower under the December 2010 loan agreement.  The February 2011 renewal agreement incorporates the terms of the loan it was renewing, including a provision simply stating the borrower, which was Pinnacle Fire Systems, LLC, would be in default if it, without Plaintiff's written consent, "organize[d], merge[d] into, or consolidate[d] with an entity; acquire[d] all or substantially all of the assets of another; [or] materially change[d] the legal structure, management, ownership or financial condition."  Notably, no questions were asked of any of the witnesses at trial regarding these provisions in the December 2010 loan and February 2011 renewal agreements, and neither party referred to these provisions in their arguments at trial.  With respect to the February 2011 renewal, it is questionable where there was a misrepresentation because the provision simply indicates Pinnacle Fire would be in default if it engaged in the described conduct.  As for both the December 2010 loan and February 2011 renewal, Pinnacle Fire did not organize or participate in the organization of another entity.  In addition, Defendant did not indicate in his testimony that he intended for Pinnacle Fire Systems to merge or consolidate with Southeastern Fire, LLC at the time he executed the December 2010

20 B.R. 842, 854 (Bankr. E.D.N.Y. 1982) ("A false representation is an express misrepresentation, while a false pretense refers to an implied misrepresentation or 'conduct intended to create and foster a false impression.'" (quoting *H.C. Prange Co. v. Schnore* (*In re Schnore*), 13 B.R. 249, 251 (Bankr. W.D. Wis. 1981))); *see also Taylor v. Davis* (*In re Davis*), 494 B.R. 842, 871-72 (Bankr. D.S.C. 2013).


## <u>CONCLUSION</u>

Defendant could have done more to notify Plaintiff about the formation of Southeastern Fire, LLC and his participation in establishing and managing Southeastern Fire, LLC. However, Plaintiff has not met its burden of proving that Defendant made fraudulent misrepresentations, that he subjectively intended to defraud it, or that it justifiably relied on the Jobs Status and Bids Made in 2010 list. Rather, the evidence suggests Defendant formed and managed Southeastern Fire, LLC under his mother's mantle in an effort to compete for contracts for which his other companies could not compete and to gain an advantage over competitors in bidding for contracts where having a company under the ownership of a disabled veteran was advantageous. He undertook these efforts to again compete in the fire suppression industry and to pay his creditors, including Plaintiff.

---

loan and February 2011 renewal agreements. Consequently, the Court does not find the New Organizations clause in the December 2010 loan agreement or the default provision in the February 2011 renewal agreement to be fraudulent misrepresentations made with intent to deceive or that these provisions show intent to deceive in connection with the July 2010 consolidation loan. Furthermore, Plaintiff's 2010 underwriting package indicated that as of January 1, 2010, Plaintiff believed Southeastern Fire of Georgia and National Fire Suppression were merging into Pinnacle Fire Systems. This may or may not have occurred since Southeastern Fire of Georgia and National Fire Suppression were not dissolved until 2011. Finally, the existence of the New Organizations clause in the December 2010 loan agreement and the default provision in the February 2011 renewal agreement does not demonstrate Defendant acted with intent to create and foster a false pretense when he formed and operated Southeastern Fire, LLC.

For the reasons set forth herein, the Court finds that the debt Defendant owes to Plaintiff is dischargeable.

AND IT IS SO ORDERED.

**FILED BY THE COURT**
**10/31/2013**



David R. Duncan
Chief US Bankruptcy Judge
District of South Carolina

Entered: 11/01/2013